UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
CHRISTOPHER B. SHAW,

                                        Plaintiff,

                - against -

JOHN MCHUGH, SECRETARY, DEPARTMENT OF
THE ARMY,

                                        Defendant.
----------------------------------------------------------------------x

**OPINION AND ORDER**

No. 12-CV-6834 (CS)

<u>Appearances</u>:
Michael Sussman
Sussman & Watkins
Goshen, New York
*Counsel for Plaintiff*

Tomoko Onozawa
Assistant United States Attorney
Southern District of New York
New York, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

        Before the Court is the motion for summary judgment of Defendant John McHugh.

(Doc. 26.)  For the reasons stated below, the Motion is GRANTED.

I.  **Background**

        The following facts, which are based on the parties' Local Rule 56.1 statements and

supporting materials, are undisputed unless noted.

        Plaintiff Christopher Shaw, an African-American, began work in July 2006 as a

Supervisory Security Specialist[1] under the Directorate of Emergency Services ("DES") at the

---

[1] This position is also referred to as "Installation Security Officer."  (Shaw Dep. 29.)  "Shaw Dep." refers to the
Deposition of Christopher Shaw, dated November 7, 2013, which was attached as Exhibit 1 to the Affirmation of

United States Army Garrison in West Point, New York ("West Point").  (Shaw Dep. 28-30.)

From July 2006 to the present, Plaintiff has held the same position.  (*Id.*)  Defendant is John

McHugh, the Secretary of the Department of the Army, in his official capacity.

DES is the department responsible for law enforcement, fire services and physical

security at West Point.  (*Id.* 30.)  At all relevant times, Plaintiff was the only Supervisory

Security Specialist at DES, (*id.*; P's 56.1 Stmt. ¶ 3),[2] and reported to his first-line supervisor, and

Director of DES, Lieutenant Colonel ("Lt. Col.") Thomas Hawes, a Caucasian, (P's 56.1 Stmt. ¶

5; Shaw Dep. 31-32, 181).  Plaintiff's second-line supervisor was Deputy to the Garrison

Commander at West Point, Wilfred Plumley, a Caucasian.  (P's 56.1 Stmt. ¶ 6.)  Plaintiff's third-

line supervisor was the Garrison Commander at West Point, Colonel ("Col.") Michael J. Tarsa,

also a Caucasian.  (*Id.* ¶ 7.)  One of Plaintiff's primary roles at DES was to ensure that

contracted-for goods and services were received and performed in a satisfactory manner, and to

certify receipt of those goods and services in order to facilitate payment.  (P's 56.1 Stmt. ¶ 4;

Carroll Decl. ¶ 9.)[3]  Plaintiff served in this role with respect to the two contracts discussed below.

(P's 56.1 Stmt. ¶ 4.)

The Directorate of Contracting is the West Point department responsible for, among other

things, soliciting, awarding, preparing and issuing contracts.  (P's 56.1 Stmt. ¶ 11.)  The

department also provides administrative oversight for awarded contracts, which includes

responsibility for the modification of an awarded contract (known as a "mod") if the scope, cost

---

Michael H. Sussman, ("Sussman Aff."), (Doc. 40), submitted in opposition to Defendant's Motion for Summary Judgment.

[2] "P's 56.1 Stmt." refers to Plaintiff's Reply to Defendant's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1(a), (Doc. 38).

[3] "Carroll Decl." refers to the Declaration of Jean Carroll, dated May10, 2014, (Doc. 29), which was attached to the Memorandum of Law in Support of Defendant's Motion for Summary Judgment, (Doc. 27 ("D's Mem.")).

or timing of the work, as initially agreed upon, needs to be changed.  (*Id.* ¶ 12; *see id.* ¶ 30.)  For a contractor to receive payment from the Army, Department of Defense ("DOD") policy requires the submission of three documents:  (1) an invoice from the contractor, (2) an "end user's"[4] receiving report confirming the acceptance of goods or services and certifying that the invoice should be paid, and (3) the actual contract itself.  (*Id.* ¶¶ 6-7.)  Defense Financing and Accounting Services ("DFAS") then reviews the documents and, if there are no errors, will process the payment.  (*Id.*)

A.  <u>The Energy Pro Contract</u>

On September 24, 2008, the Directorate of Contracting awarded a contract to Energy Pro O.S.C., LLC ("Energy Pro") for the purchase and installation of three 230-kilowatt ("kw") generators for $46,350 each.  (Shaw Dep. 158-59; Carroll Decl. Ex. 1.)  The generators were purchased to provide backup power to gates at three different West Point access control points.  (Shaw Dep. 71-72; Carroll Decl. ¶ 12.)  Plaintiff was responsible for ensuring that the contracted-for generators and services were satisfactorily received and installed and for certifying payment.  (P's 56.1 Stmt. ¶ 4.)  Plaintiff's point of contact at the Directorate of Contracting was Vivian Malta, a Caucasian, who was the Contracting Specialist assigned to the Energy Pro contract.  (*Id.* ¶ 14; Shaw Dep. 87-88, 239.)  Malta's supervisor was Contracting Officer Jean Carroll, also a Caucasian.  (P's 56.1 Stmt. ¶¶ 8, 10.)  On approximately May 13, 2009, Plaintiff authorized for payment a $92,700 Energy Pro invoice, covering the purchase and installation of two of the three 230-kw generators, despite the fact that none of the generators had

---

[4] The "end user" is the individual responsible for ensuring satisfactory performance under the contract.  (Carroll Decl. ¶ 7.)

been received at that time.[5]  (*Id.* ¶¶ 15-17; Carroll Decl. Exs. 4-6.)  The payment was approved by DFAS and paid on approximately June 8, 2009.  (P's 56.1 Stmt. ¶ 18.)

At an unspecified date it was determined that the installation site of one of the three generators needed to be changed.  (*Id.* ¶19.)  After learning of the relocation, Energy Pro, in a November 12, 2009 email to Plaintiff, quoted a proposed additional cost of $75,966, over the original $139,050 contract price, and informed Plaintiff that it had $46,350 left to invoice on the original contract.  (*Id.* ¶¶ 22-23; Carroll Decl. Ex. 3, at 573-74.)  That same day, approximately two months before the generators were delivered,[6] Plaintiff requested that Energy Pro invoice the Army for $40,000, (P's 56.1 Stmt. ¶ 24; Carroll Decl. Ex. 3, at 573), and Energy Pro submitted an invoice accordingly, (P's 56.1 Stmt. ¶ 26; Carroll Decl. Ex. 8).

Under federal financial acquisition regulations, a contractor cannot perform work on a military installation without either a contract or contract modification covering that work.  (P's 56.1 Stmt. ¶ 31; Onozawa Decl. Ex. 3, at 22-23.)[7]  Because the Energy Pro contract did not cover the new installation site, a modification – signed by a Contracting Officer, and forwarded to the contractor for acceptance – was required to authorize Energy Pro to perform that work.  (P's 56.1 Stmt. ¶¶ 29-30.)  Plaintiff brought the need for additional work to the attention of Cole Wetzel, a Caucasian budget officer in the West Point Resource Management Office, who was responsible for the allocation of budgeted funds.  (*Id.* ¶¶ 27-28.)  Plaintiff explained to Wetzel that he had

---

[5] Plaintiff denies Defendant's assertion of fact that "[n]one of the generators under the Energy Pro Contract had been delivered to West Point as of May 13, 2009," citing to Plaintiff's deposition at page 80.  (P's 56.1 Stmt. ¶ 17.)  Plaintiff's deposition at page 80 does not support his position.  Rather, in response to Defendant's question, "Do you recall when the generators arrived?," Plaintiff answered, "No, ma'am."  (Shaw Dep. 80.)  Moreover, Plaintiff, in his Reply to Defendant's Statement of Undisputed Facts, unequivocally admits that "[i]n December 2009, Energy Pro delivered three generators to West Point," (P's 56.1 Stmt. ¶ 41), and also refers to an email he received from Energy Pro stating that "the Gens will be installed by the 2d week of December," (*id.* ¶ 34).

[6] *See* note 5 above.

[7] "Onozawa Decl." refers to the Declaration of Tomoko Onozawa, (Doc. 30), which was attached to D's Mem.

been unable to get in touch with Jean Carroll – the Contracting Officer for the Energy Pro

contract who needed to sign the modification – and that he felt he was "under the gun to get the

project done." (*Id.* ¶¶ 29-30, 33; D's 56.1 Stmt. ¶ 85.)[8]  Plaintiff claims that, after being

informed of the need for a modification, Wetzel replied, "Okay," which Plaintiff understood to

mean that "[e]verything would be done." (P's 56.1 Stmt. ¶ 32; Shaw Dep. 67-68.)[9]  On

November 25, 2009, Plaintiff sent Energy Pro an email stating he had just spoken to his resource

manager and "things look like a go with the additional cost.  I have to contact contracting with

your new bill and then they do a mod and my resource people certify the funds." (P's 56.1 Stmt.

¶ 35; Carroll Decl. Ex. 3, at 572.)  Plaintiff never spoke to Carroll, or anyone in the Directorate

of Contracting, regarding an Energy Pro contract modification, (P's 56.1 Stmt. ¶ 39), nor did he

have authority to approve the additional cost for Energy Pro himself, (*id.* ¶ 36).  On December 3,

2009, in response to an email from Energy Pro inquiring as to whether the new quote was

"sufficient for the funding personnel," Plaintiff informed Energy Pro that "the quote was

sufficient for the resource folks," and that Plaintiff had to "provide a write up of why the

additional cost . . . .  I have informed them of the additional cost and within my budget this year I

have the funds just got to get the administration part done." (*Id.* ¶ 38; Carroll Decl. Ex. 3, at

570.)[10]

---

[8] "D's 56.1 Stmt." refers to Defendant's Response to Plaintiff's Rule 56.1 Counter Statement, (Doc. 36).

[9] Wetzel testified that he recommended to Plaintiff that Plaintiff work with Contracting to get the "mod" in place before Energy Pro did the work, and that Plaintiff later told Wetzel that Plaintiff had not but should have followed Wetzel's advice.  (Sussman Aff. Ex. 3, at 20-21.)  For purposes of the motion, I accept Plaintiff's version.

[10] Notwithstanding his statements in the November 25, 2009 email that he had to contact contracting, and in the December 3, 2009 email that he had "to get the administration part done," Plaintiff in his Affidavit in Opposition to Defendant's Motion for Summary Judgment, (Doc. 39) ("P's Aff."), claims he thought Wetzel would take care of getting the modification done, (P's Aff. ¶¶ 7-10).

Later that month, Energy Pro delivered three generators,[11] which Plaintiff physically inspected to ensure they were the generators that were ordered under contract.  (P's 56.1 Stmt. ¶¶ 41-42.)  Although the contract called for three 230-kw generators, delivery was made of two 35-kw generators and one 60-kw generator.  (*Id.* ¶ 43.)  Despite Plaintiff's physical inspection of the generators, he did not notice the difference between the delivered generators and the generators ordered in the contract.  (*Id.* ¶¶ 45-46.)[12]

Thereafter, on January 26, 2010, at the request of Plaintiff's assistant, Energy Pro submitted an invoice for the balance of the contract, totaling $80,416, reflecting the costs for the additional work performed.  (*Id.* ¶ 51.)  Plaintiff's assistant submitted the invoice to Jean Carroll, who then sent a letter to Energy Pro requesting that they "cease work immediately," and contacted DFAS to instruct them not to pay either the $40,000 invoice dated November 12, 2009 or the $80,416 invoice dated January 26, 2010.  (Carroll Decl. ¶¶ 38-39 & Ex. 10.)  On February 5, 2010, Carroll formally requested that the West Point Office of the U.S. Army Criminal Investigation Command ("CID") investigate Plaintiff for:  his May 2009 approval of a $92,700 payment to Energy Pro for three generators that had not been received and installed, his directing Energy Pro to proceed with additional work not authorized under contract that resulted in a new invoice $80,416 over the original contract price, and his directing Energy Pro to invoice the Army for $40,000 before the generators were delivered.  (Carroll Decl. Ex 11.)

B.   The Trident Contract

On August 7, 2008, the Directorate of Contracting awarded a contract to Trident Security Devices, Inc. ("Trident") for the purchase and installation of ten vehicle barrier systems at four

---

[11] *See* note 5 above.

[12] Plaintiff argues that the delivered generators were appropriate and that the wrong ones had been ordered.  (*See* note 17 below.)

locations at West Point for $768,380.  Like the Energy Pro contract, Plaintiff was responsible for ensuring that the contracted-for goods and services were satisfactorily received and performed. (P's 56.1 Stmt. ¶ 4.)  Specifically, Plaintiff was responsible for preparing the statement of work for the Trident contract, "look[ing] and see[ing] the progress of the work," and certifying invoices.  (*Id.* ¶ 54; Shaw Dep. 119, 121.)  Bob Pizzano, a Caucasian, was the contracting specialist at the Directorate of Contracting assigned to the Trident contract, and was supervised by Contracting Officer Jean Carroll.  (P's 56.1 Stmt. ¶ 53; Shaw Dep. 239; Carroll Decl. ¶ 5.)

Trident completed barrier installations at three of the four contracted-for locations when it ceased work on the barrier project at end of February or beginning of March 2010.  (P's 56.1 Stmt. ¶ 55; Carroll Decl. ¶¶ 43-47.)  Over two months earlier, on December 8, 2009, despite the fact that the work was not complete, Plaintiff informed the president of Trident that he could "go ahead and invoice for the remaining amount of the contract."  (P's 56.1 Stmt. ¶ 56; Carroll Decl. Ex. 14, at 613.)  Plaintiff then authorized the payment and, on approximately January 25, 2010, DFAS paid Trident $94,000, the remainder of the contract balance.  (*Id.* ¶¶ 57-58.)  Although Plaintiff claims he did not want to certify payment for work that was not complete, he attributes his decision to, among other things, a general concern among supervisors that uncertified invoices could incur interest.  (*Id.* ¶ 57; Shaw Dep. 127-31.)  Plaintiff was unable to recall with specificity who instructed him to certify invoices for unfinished work in general or the Trident invoice in particular, but testified that Plumley told him accrual of interest was a concern.  (Shaw Dep. 127-31.)

While Trident was performing under the contract, it came to the attention of West Point personnel that the Army Corps of Engineers had awarded an Army-wide contract to perform the same type of work called for under the Trident contract.  (Carroll Decl. ¶ 44; P's 56.1 Stmt. ¶

59.)  Ultimately, the decision was made to have the Army Corps of Engineers complete the barrier installation, rather than Trident.  (P's 56.1 Stmt. ¶ 59.)  Accordingly, the Directorate of Contracting issued a contract modification seeking termination of the remaining work under the Trident contract and "deobligation," which would release the funds previously reserved for the Trident contract.  (*Id.* ¶ 60.)  As a result of Plaintiff's payment authorizations, however, Trident had already been paid the full contract amount of $768,000, and refused to return the $94,000 paid for work not completed.  (*Id.* ¶¶ 61-62.)  The government has sued Trident to recover the disputed funds.  (*Id.* ¶ 63.)

On March 17, 2010 Carroll formally requested Internal Revenue and Audit Compliance at West Point to investigate the events relating to the Trident contract, including the full payment before the work was complete.  (Carroll Decl. ¶ 52 & Ex. 16.)

C.  The CID Investigation and Plaintiff's Suspension

As a result of Carroll's referrals regarding the Energy Pro and Trident contracts, CID launched an investigation, (Onozawa Decl. Ex. 9), and in June 2010, Plaintiff was interviewed by CID agents.  With respect to the Energy Pro contract, Plaintiff conceded, "in hindsight," that had he "looked at the identification plates on the generators . . . he would have discovered that the generators delivered were not what were ordered on the contract."  (P's 56.1 Stmt. ¶ 64; Shaw Dep. 163-64; Onozawa Decl. Ex. 10, at 60-61.)  He also admitted that "he did not know a 35 kw generator from a 230 kw generator and it was his fault for not physically checking" the identification plates on the machines, (P's 56.1 Stmt. ¶ 65; Shaw Dep. 164; Onozawa Decl. Ex. 10, at 61), and that he released payments to Energy Pro because, among other things, he "assumed that the work was almost completed," and "the whole process had taken so long that he wanted to pay Energy Pro because he believed they were fulfilling the contract," (P's 56.1

Stmt. ¶¶ 66-67; Shaw Dep. 160; Onozawa Decl. Ex 10, at 61).  Further, although Plaintiff "felt

pressure[d] to keep the project going from his boss [Lt. Col. Hawes] . . . [he] admitted that it was

his fault for losing focus and not paying attention to the contract as a whole."  (P's 56.1 Stmt. ¶

69; Shaw Dep. 161; Onozawa Decl. Ex. 10, at 62.)

     With respect to the Trident contract, Plaintiff explained that he certified payment to

Trident because, among other things, he wanted "to avoid being delinquent on the list of

invoices."  (P's 56.1 Stmt. ¶ 71; Shaw Dep. 173-74; Onozawa Decl. Ex. 10, at 62.)  He also

certified the payment based on his belief that the Army would use Trident to complete the

unfinished portion of the barrier project.  (P's 56.1 Stmt. ¶ 70; Shaw Dep. 172-73; Onozawa

Decl. Ex. 10, at 62.)

     During the course of its investigation, CID issued a status report, dated November 23,

2010, noting, among other things, that, "the adverse impact [of Plaintiff's actions] to the Army is

approximately $140,000 in monetary damages."  (Onozawa Decl. Ex. 14, at 51-54.)  In

December 2010, CID sent an interim report on its findings to Lt. Col. Hawes.  (*Id.* Ex. 15.)

     As a result of the investigation's findings, on May 4, 2011, Hawes proposed to suspend

Plaintiff for 30 days for Negligence Resulting in Unwarranted Expenditure of Government

Funds, based on the following:  (1) on May 12, 2009 Plaintiff certified the delivery of three 230-

kw generators under the Energy Pro contract, even though the generators were not delivered until

December 15, 2009; (2) the generators that were delivered were not in compliance with the

contract; (3) Plaintiff authorized a modification to the Energy Pro contract obligating the

government to an additional $80,000 when he was not authorized to do so; (4) Plaintiff certified

payment of $90,000 for vehicle barriers under the Trident contract even though Trident had not

completed the full scope of the contracted-for work; and (5) Plaintiff admitted he certified and

released payments to Energy Pro without verifying the make and model of the generators, authorized a modification of the scope of work under the Energy Pro contract, and certified and released payment of $90,000 to Trident without verifying that the contracted-for work had been completed.  (P's 56.1 Stmt. ¶¶ 75-76; Onozawa Decl. Ex.16, at 181-82.)

Plaintiff appealed Hawes' recommended 30-day suspension at a May 16, 2011 in-person meeting with his second-line supervisor, Plumley.  (P's 56.1 Stmt. ¶¶ 78-79.)  At the meeting, Plaintiff attributed his conduct to, among other things, medical issues and pressure to certify payments as quickly as possible.  (*Id.* ¶ 79; Onozawa Decl. Ex. 18, at 178.)  Plaintiff also argued that accepting the generators "was an administrative error and [he] only deserve[d] a letter of reprimand as punishment."  (P's 56.1 Stmt. ¶ 81 Onozawa Decl. Ex. 18, at 179.)  On July 13, 2011, Plumley issued a Notice of Decision upholding the suspension but reducing the period to 14 days.  (Onozawa Decl. Ex. 18, at 179; P's 56.1 Stmt. ¶ 80.)

Plaintiff appealed Plumley's Notice of Decision to Col. Tarsa at an in-person meeting on July 28, 2011.  (P's 56.1 Stmt. ¶¶ 82-83.)  Plaintiff memorialized the meeting in a written memorandum he composed later that day.  (*Id.* ¶ 83; Onozawa Decl. Ex. 19.)  In his memorandum, Plaintiff recounted asking why "no one else g[ot] in trouble" for the contract mishaps.  (Onozawa Decl. Ex. 19.)  Col. Tarsa responded that Plaintiff was "a trained [Contracting Officer Representative]" and his "ineptitude . . . cost the Government to lose $90K."  (*Id.*; P's 56.1 Stmt. ¶ 85.)  On August 2, 2011, Col. Tarsa issued an Administrative Grievance Report upholding the 14-day suspension, noting that it was Plaintiff's responsibility to "competently meet [his] professional responsibilities," and adding that "the government is still waiting for $90,000 owed . . . as a result of [Plaintiff's] negligence."  (P's 56.1 Stmt. ¶ 87;

Onozawa Decl. Ex. 20.)  As a result, Plaintiff was suspended from August 7-13, 2011, and August 21-27, 2011.  (P's 56.1 Stmt. ¶ 88.)

On September 29, 2011, Plaintiff filed an Equal Employment Opportunity Formal Complaint of Discrimination, naming Lt. Col. Hawes, Plumley, and Col. Tarsa as "[p]arties involved."  (Onozawa Decl. Ex. 22, at 41.)  In the complaint, Plaintiff claimed he was "discriminated against" on the basis of race and nationality, and for "not towing the party line, and not agreeing to accomplish or execute duties which were not proper."  (*Id.*)  On December 6, 2012 the Department of the Army, Office of the Assistant Secretary, Manpower and Reserve Affairs, issued a final decision finding that Plaintiff was not subject to discrimination.  (*Id.* Ex. 23.)

In the instant lawsuit, Plaintiff asserts that, in suspending him, Defendant ignored Plaintiff's "contention that Caucasians were at least equally responsible for causing the disputed payment for the delivery and installation of back-up generators," yet "no similar finding" was made, and "no similar punishment" was imposed, with respect to the "equally responsible" Caucasians.  (Complaint ("Compl.") (Doc. 1) ¶¶ 7, 10.)  Further, Plaintiff asserts that he was punished for authorizing the barrier payment, which he did "on the basis of reasonable assumptions and standard operating procedures," (*id.* ¶¶ 13, 17), and that Caucasian supervisors who were "responsible for the authorization of similar payments" were not held responsible, (*id.* ¶ 18.)

Plaintiff brings a claim against Defendant for discrimination on the basis of race, under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq*.

## II.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the

motion, it "must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R.

Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d

Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of

fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed

for purposes of the motion" or "grant summary judgment if the motion and supporting

materials – including the facts considered undisputed – show that the movant is entitled to it."

Fed. R. Civ. P. 56(e)(2), (3).

     "Though caution must be exercised in granting summary judgment where intent is

genuinely in issue, summary judgment remains available to reject discrimination claims in cases

lacking genuine issues of material fact."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d

Cir. 1994) (citation omitted); *see Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d

Cir. 2001) ("[S]ummary judgment may be appropriate even in the fact-intensive context of

discrimination cases. . . . [T]he salutary purposes of summary judgment – avoiding protracted,

expensive and harassing trials – apply no less to discrimination cases than to other areas of

litigation.") (alteration and internal quotation marks omitted).

## III.  Discussion

    A.  Title VII Claim

     Title VII discrimination claims are analyzed pursuant to the burden-shifting framework

established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973), and its progeny.

Under this framework, a plaintiff bears the initial burden of establishing a *prima facie* case of

discrimination.  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  At the *prima*

*facie* stage, the burden of proof is minimal.  *See id.*  To make out a *prima facie* case of discrimination, a plaintiff must show that, "(1) [he] was within the protected class; (2) [he] was qualified for the position; (3) [he] was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009); *see Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001); *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 571 (S.D.N.Y. 2010).

Once a *prima facie* case is established, "a rebuttable presumption of discrimination arises" and the burden of production shifts to the defendant "to articulate a legitimate, non-discriminatory reason" for the adverse employment action.  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).  "[T]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis and alteration in original) (internal quotation marks omitted).

Once the defendant proffers a legitimate, non-discriminatory reason for the challenged employment action, the presumption drops away, and the plaintiff must prove that the reason offered by the defendant was not its true reason but rather a pretext for unlawful discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001); *Slattery*, 248 F.3d at 93.  The plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (alterations and internal

14

quotation marks omitted).  "To get to the jury, 'it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.'"  *Id.* (alterations omitted) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519).  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."  *Id.*  The ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated.  *See Reeves*, 530 U.S. at 143.

B.  Prima Facie Case

Defendant contests whether the adverse action occurred under circumstances giving rise to an inference of discrimination.  (D's Mem. 18-19.)  Plaintiff attempts to show discriminatory intent in three ways:  (1) by comparing himself to several Caucasian West Point personnel who Plaintiff alleges were similarly situated to him yet not disciplined; (2) by pointing to comments by his supervisor that he argues demonstrate race-based animus; and (3) by disputing the propriety of the discipline imposed.  Plaintiff's showing in each of these respects, however, is insufficient to create a factual dispute as to Defendant's discriminatory intent.

1.  *Comparators*

Plaintiff can raise an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).  Plaintiff must identify similarly situated employees, or comparators, whose situations have a high degree of similarity to his own.  *See Berube v. Great Atl. & Pac. Tea Co.*, 348 F. App'x 684, 685 (2d Cir. 2009) (summary order) (comparator "must be similarly situated in all material respects"); *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53–54 (2d Cir. 2001) (same).  Showing similarity "in all material

15

respects" requires that the plaintiff and comparators were  (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct."  *Graham*, 230 F.3d at 39-40.  "The standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," meaning Plaintiff's and his comparators' conduct must be "of comparable seriousness."  *Id*.

Plaintiff identifies as similarly situated a variety of West Point personnel with various ranks from various departments.  With respect to the Energy Pro contract – which, as discussed above, Plaintiff admits mishandling – he points to several Caucasian people who were "at least equally responsible for" the disputed payment for the generators and not disciplined:  (1) Malta, Carroll, and their supervisor David Bugger of the Directorate of Contracting; (2) Mike Neilson of the Department of Public Works; (3) Wetzel of the Resource Management Office; and (4) Lt. Col. Hawes, Plaintiff's first-line supervisor.  (P's 56.1 Stmt. ¶ 100; Shaw Dep. 244-45.)  And, more broadly, with respect to the disputed payments under both contracts, Plaintiff claims that the following Caucasian supervisors were not disciplined for authorizing payments "similar" to the payments for which Plaintiff was disciplined:  Bugger, Carroll, Lt. Col. Hawes, Col. Tarsa, Col. Bruno,[13] and "pretty much every other director of the installation," including "DPW supervisors."  (P's 56.1 Stmt. ¶ 101; Shaw Dep. 141-44, 247.)  But Plaintiff was unable to provide any specifics as to any such payments, (P's 56.1 Stmt. ¶¶ 102-05), and thus there is no basis to regard them as "similar."  And putting that aside, none of these individuals are similarly situated.

First, Plaintiff cannot establish that any of the supposedly similarly situated individuals "shared sufficient employment characteristics" with Plaintiff.  *McGuinness*, 263 F.3d at 53.

---

[13] Col. Bruno was a Garrison Commander at West Point before Col. Tarsa.  (Shaw Dep. 62-63.)

Distinctions in assignment, reporting structure, responsibilities and workplace standards undercut Plaintiff's argument that his comparators are similarly situated.  Plaintiff was the only Supervisory Security Specialist in DES, and none of his comparators, with the exception of Lt. Col. Hawes, worked in that department.  The Directorate of Contracting is a distinct department from DES, with different responsibilities, functions and supervisors.[14]  Accordingly, Malta, Carroll and Bugger are not similarly situated to Plaintiff.[15]  *See Foss v. Coca Cola Enters.*, No. 07-CV-1322, 2011 WL 1303346, at *8 (E.D.N.Y. Mar. 31, 2011) (plaintiff not similarly situated to comparator when performed different job in different department with different supervisor) (collecting cases); *Wallace v. Seacrest Linen*, No. 04-CV-6035, 2006 WL 2192777, at *6 (S.D.N.Y. Aug. 2, 2006) (plaintiff and comparator not subject to same workplace standards where they performed different job functions) (collecting cases).  The same reasoning applies to Mike Neilson in the Department of Public Works and Cole Wetzel in the Resource Management Office.  Further, Lt. Col. Hawes, Col. Tarsa and Col. Bruno are not similarly situated to Plaintiff because supervisors are generally not considered materially similar to supervisees.  *Hesse v. Dolgencorp of N.Y., Inc.*, No. 10-CV-421, 2014 WL 1315337, at *21 (W.D.N.Y. Mar. 31, 2014)

---

[14] Aside from the differences between the functions of DES and the Directorate of Contracting, the departments' reporting structure also illustrates the distinction between the two.  Plaintiff's chain of command at the relevant time consisted of Lt. Col. Hawes (the Director of DES), Plumley, and Col. Tarsa.  On the other hand, the Directorate of Contracting was supervised by David Bugger, the Director of Contracting, (Shaw Dep. 236-37), who was in turn supervised by George Cabaniss, the Deputy Commander of the Mission and Installation Contracting Command in San Antonio, Texas, (Carroll Decl. ¶ 4).

[15] Contrary to Plaintiff's deposition testimony – in which he testified that he and personnel at the Directorate of Contracting had different supervisors at the time in question, (Shaw Dep. 108-09, 236-37) – he now, in his affidavit, asserts that the "Garrison Commander and his deputy ha[d] authority over all those responsible for incurred delays on both projects," (P's Aff. ¶ 16).  It is well settled that an affidavit submitted in connection with a summary judgment motion may be disregarded to the extent it contradicts the party's deposition.  *See Mack v. United States*, 814 F.2d 120, 124–25 (2d Cir. 1987); *Daley v. McNeil Consumer Prods. Co.*, 164 F. Supp. 2d 367, 376 (S.D.N.Y. 2001).  Moreover, even if the Garrison Commander and his deputy have authority over everyone at the base, that does not mean that everyone has the same chain of command, given the supervisory layers between the Commander and any given employee.

(plaintiff cannot be said to be similarly situated to her superior); *Hernandez v. City of N.Y.*, No. 11-CV-3521, 2013 WL 593450, at *4 (E.D.N.Y. Feb. 13, 2013) ("Examples of what constitutes [similarly situated in] a 'material respect' are holding the same positions of roughly the same rank, and being subject to the same performance review and disciplinary standards."); *Wood v. Sophie Davis Sch.*, No. 02-CV-7781, 2003 WL 22966288, at *6 (S.D.N.Y. Dec. 15, 2003) (plaintiff's purported comparators not similarly situated because they were "actually all her supervisors," making comparisons between them inapposite); *Ortiz v. Brookstone Co.*, 274 F. Supp. 2d 456, 463-64 (S.D.N.Y. 2003) (fact that plaintiff's comparator was a direct supervisor, among other factors, led to conclusion that they were not similarly situated).

Second, even if Plaintiff could point to individuals with whom he shared sufficient employment characteristics, Plaintiff cannot identify anyone who engaged in conduct comparable to the actions that resulted in Plaintiff's suspension.  Throughout Plaintiff's arguments that others made equally serious errors, he ignores the glaring issue fatal to his attempt to identify similarly situated employees:  even if Plaintiff could show adequate comparators with respect to either the Energy Pro or Trident contracts – which he has not done – Plaintiff does not identify anyone who engaged in conduct similar to Plaintiff's in mishandling *both* the Energy Pro and Trident contracts (or even two other contracts).  As Plaintiff testified, the basis for his suspension was his actions regarding both contracts, not just one.  (Shaw Dep. 70-71.)  Moreover, Plaintiff admits that he has no recollection of, or information regarding, anyone who made "similar payments."  (P's 56.1 Stmt. ¶ 104; *see id.* ¶ 77; Shaw Dep. 182-85.) These facts defeat Plaintiff's attempt to identify similarly situated individuals.  Accordingly, because "there are many distinguishing factors between plaintiff and the comparators, the court may conclude as a matter of law that they are not similarly situated."  *Watson v. Geithner*, No.

09-CV-6624, 2013 WL 5420932, at *10 (S.D.N.Y. Sept. 27, 2013) (internal quotation marks omitted).

### 2. *Comments Regarding Plaintiff's Race*

Plaintiff further attempts to show Defendant's discriminatory intent by providing two examples of remarks made by his supervisor, Lt. Col. Hawes, on unspecified dates.  First, Plaintiff claims Lt. Col. Hawes would "raise his hands . . . click his heels and say, 'Chris Shaw in charge.'"  (Shaw Dep. 35.)  Hawes did so approximately weekly, and it offended Plaintiff because "the only people [he] knew who did that was the Nazis."  (*Id.*; P's 56.1 Stmt. ¶ 106.)  Second, Plaintiff claims that, when President Obama was running for President, Hawes would say, "I know you're going to vote for Obama because he's your kind."  (Shaw Dep. 40.)

These comments do not suffice to create a fact issue as to Defendant's discriminatory intent.  *See, e.g.*, *Sloan v. United Techs. Corp.*, No. 14-CV-396, 2015 WL 895419, at *1 (2d Cir. Mar. 4, 2015) (summary order) (rejecting an inference of discriminatory causation where remarks were either facially race neutral or too removed from the adverse action).  The remark "Chris Shaw in charge" is race-neutral and benign.  Snapping to attention when jocularly greeting a co-worker, particularly at a military base, hardly suggests that one shares the views of the Nazis.  The remark about President Obama, while reasonably interpreted as referring to Plaintiff's race, is similarly not probative of discrimination because statements that merely acknowledge an individual's membership in a protected class do not support an inference of discriminatory animus.  *See Pasha v. William M. Mercer Consulting, Inc.*, No. 00-CV-8262, 2004 WL 188077, at *4 (S.D.N.Y. Feb. 2, 2004).  Further, Plaintiff fails to establish a temporal

relationship between the remarks and the suspension decision.[16]  Without more, the remarks'

temporal attenuation from and irrelevance to the suspension decision defeat any inference of

discrimination.  *See Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[T]he

more remote and oblique the remarks are in relation to the employer's adverse action, the less

they prove that the action was motivated by discrimination."), *abrogated on other grounds by*

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009); *Campbell v. Alliance Nat'l Inc.*, 107

F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks . . . unrelated to the decision process are

rarely given great weight, particularly if they were made temporally remote from the date of the

decision.") (internal quotation marks omitted).

> The fact that Hawes recommended Plaintiff's suspension does not change the analysis.
Plaintiff appealed Hawes' proposal at in-person meetings with both Plumley and Tarsa, resulting

in the reduction of the duration of Plaintiff's suspension to 14 days.  Plaintiff testified that

neither Plumley nor Tarsa said anything that led him to believe they were discriminating against

him because of his race.  (Shaw Dep. 207-08, 222-23.)  And, to the extent Hawes could be

viewed as a decision maker, or one whose recommendation was sought by the decision maker,

*see Rizzo v. Amerada Hess Corp.*, No. 99-CV-0168, 2000 WL 1887533, at *5 (N.D.N.Y. Dec.

29, 2000), "the stray remarks of a decision-maker, without more, cannot prove a claim of

employment discrimination," *Abdu-Brisson*, 239 F.3d at 468.  Hawes' remarks, assuming he was

a decision maker, bear no relation in context or (apparently) time to the suspension decision, and

cannot reasonably be interpreted as demonstrating racial prejudice.  *See Henry v. Wyeth Pharms.,*

*Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (discussing factors to be considered in determining if

---

[16] While dates are not provided for either of the remarks, the remark regarding President Obama, made "when President Obama was running," was likely made in 2008 or earlier – approximately three years prior to Plaintiff's suspension decision (or, conceivably, in 2012 after the decision).

remark is probative of discriminatory intent.)  They thus do not suffice to defeat summary judgment.

### 3.   *Disagreement with Suspension Decision*

At the foundation of Plaintiff's argument is his belief that a 14-day suspension was too harsh.  Instead, Plaintiff believes that "[a] written letter of reprimand" would have been the appropriate punishment.  (*Id.* 200; Onozawa Decl. Ex. 18, at 179.)  Indeed, in a written memorandum to CID, Plaintiff accepted fault for not recognizing that the wrong generators were delivered.  (Onozawa Decl. Ex. 12, at 878.)  He further admits that discipline was justified because "it would serve as a reminder to me to dot all the I's, cross all the T's.  And . . . it would serve as an example for those that I supervise and other people see."  (Shaw Dep. 200.)

As an initial matter, it is not the role of the Court to review the correctness of an employer's employment decisions or the processes by which those decisions are made. *Sassaman v. Gamche*, 566 F.3d 307, 314 (2d Cir. 2009).  It is well-settled that courts in discrimination cases should not serve as "super-personnel department[s]" reviewing employer disciplinary decisions.  *Ghent v. Moore*, 324 F. App'x 55, 57 (2d Cir. 2009) (summary order); *see Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001).

Plaintiff's disagreement with Defendant's decision to suspend him cannot raise a genuine issue of disputed fact as to discriminatory intent.  *See Ricks v. Conde Nast Publ'ns., Inc.*, 6 F. App'x 74, 78 (2d Cir. 2001) (summary order) ("[A]n employee's disagreement with her employer's evaluation of her performance is insufficient to establish discriminatory intent."); *Shabat v. Blue Cross Blue Shield of Rochester Area*, 925 F. Supp. 977, 988 (W.D.N.Y. 1996) (well settled that employee's subjective belief that adverse employment action was result of discrimination is not enough to survive summary judgment motion; that plaintiff "disagrees"

with employer's evaluation of performance "is not the issue"); *see also Ricks*, 6 F. App'x at 78 ("We judge whether a plaintiff's performance is satisfactory according to 'the employer's honestly-held expectations,' and 'not the standards that may seem reasonable to the jury or judge.'") (citation omitted) (quoting *Thornley v. Penton Publ'g., Inc.,* 104 F.3d 26, 29-30 (2d Cir. 1997); *Taylor v. Polygram Records*, No. 94-CV-7689, 1999 WL 124456, at *10 (S.D.N.Y. Mar. 8, 1999) ("The determination of whether a plaintiff's job performance was satisfactory is not measured by an objective standard, but, rather 'depends on the employer's criteria for the performance of the job.'") (quoting *Thornley* 104 F.3d at 29).

Plaintiff has failed to establish, based on his comparison with others purportedly similarly situated, reference to remarks Plaintiff found offensive, or Plaintiff's subjective view that he should not have been suspended, that he was disparately treated such that a reasonable fact-finder could find an inference of discrimination by Defendant.  Thus, having failed to provide evidence creating a triable issue as to inference of discrimination, Plaintiff cannot make out a *prima facie* case of discrimination.

C.  Pretext

Even if Plaintiff had succeeded at the first stage of the *McDonnell Douglas* test, Defendant has provided a legitimate non-discriminatory reason for terminating Plaintiff: Plaintiff's documented, repeated errors in connection with the Energy Pro and Trident contracts detailed in Lt. Col. Hawes' Notice of Proposed Thirty (30) Calendar Days Suspension, (Onozawa Decl. Ex. 16), Plumley's Notice of Decision, (*id.* Ex. 18), and Col. Tarsa's Administrative Grievance Response, (*id.* Ex. 20).

Plaintiff cannot carry his burden to demonstrate that this reason is a pretext for discrimination.  "Only where an employer's business decision is so implausible as to call into

question its genuineness should [a c]ourt conclude that a reasonable trier of fact could find that it

is pretextual." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010) (summary

order).  In light of the extensive record of Plaintiff's misfeasance, he cannot meet this standard.[17]

*See Blanc v. Sagem Morpho, Inc.*, No. 07-CV-3085, 2009 WL 1813236, at *16 (E.D.N.Y. June

25, 2009) (plaintiff failed to show pretext where, among other things, "Plaintiff acknowledged

numerous incidents of unsatisfactory job performance"), *aff'd*, 394 F. App'x 808 (2d Cir. 2010);

---

[17] Plaintiff attempts to show pretext through various conclusory, unsupported and/or inadmissible allegations.  For example, in Plaintiff's affidavit he claims that the contract specification for 230-kw generators was "a typographical error," and argues that the smaller generators received "were the generators contemplated by the base when [the Army] entered into [the Energy Pro contract]." (P's Aff. ¶ 11.)  This argument, however, is not supported by the allegedly corroborating evidence cited in Plaintiff's brief ("P's Mem."), (Doc. 37), in which he refers to "proof" "gleaned from Plumley's own account that he could not recall return of the allegedly improperly-received generators and Wetzel's confirmation that he over-heard the overbearing urgency by Hawes with regard to insuring payment on [the] project," (P's Mem., at 6).  First, a Deputy Garrison Commander simply being unable to recall whether something relating to a contract occurred is a far cry from "proof," or even some evidence, that that event did not occur.  Second, Plaintiff fails to cite to any evidence regarding Wetzel allegedly overhearing Lt. Col. Hawes give such an instruction.  Plaintiff may intend to rely on Wetzel's inadmissible opinion testimony that, with respect to Plaintiff's assertion that he was "under the gun," Wetzel "would make the assumption that it was Colonel Hawes [who had Plaintiff under the gun]" based on "[j]ust knowing how Colonel Hawes reacts to things."  *See* Fed. R. Civ. P. 56(c), (Sussman Aff. Ex. 3, at 22).

Even if Plaintiff is correct about the typographical error in the Energy Pro contract, this fact would not change the outcome, because Plaintiff, by his own account:  failed to realize the wrong generators had been ordered; failed to notice after delivery that, in fact, smaller generators had been delivered than had been ordered; authorized a $92,700 payment before any generators were received or installed; authorized a costly modification that he did not have the authority to authorize; and invited a $40,000 invoice before the job was completed – all of which (in combination with the Trident events) certainly would justify the discipline, even if the smaller generators should have been ordered in the first place through no fault of Plaintiff's (although he does not explain how he knows the delivered generators were those contemplated by the base when it contracted with Energy Pro, yet can be free of responsibility for the wrong ones being ordered).  The undisputed occurrence of these mishaps, along with the absence of evidence of race-based motivation, eliminates any inference that the treatment of Plaintiff was discriminatory.

Plaintiff also disputes that the 35-kw and 60-kw generators were worth less than the 230-kw generators. (P's 56.1 Stmt. ¶ 44.)  But there is no dispute that CID's status report, (Onozawa Decl. Ex. 14) – which was presumably available to his supervisors when they considered his discipline (*see id.* Ex. 15) – stated that Plaintiff's conduct had cost the Army $140,000, (*id.* Ex. 14, at 54).  Further, it is clear from Col. Tarsa's memorandum, (*id.* Ex. 20), and Plaintiff's description of their conversation, (*id.* Ex. 19), that the approximately $90,000 lost as a result of the Trident contract was the main driver of the discipline.

Finally, with respect to Plaintiff's claim that "others made serious errors in the contracting process and none was disciplined," (P's Mem. at 10), this argument fails to show pretext for the same reasons that Plaintiff failed to establish his *prima facie* case:  he still cannot identify a similarly situated comparator.  *See Graham*, 230 F.3d at 39.

*Iverson v. Verizon Commc'ns*, No. 08-CV-8873, 2009 WL 3334796, at *5 (S.D.N.Y. 2009)

("Merely disagreeing with a supervisor's assessment of work performance . . . is insufficient to

raise a triable issue of fact regarding pretext.") (internal quotation marks omitted).

　　　　While Plaintiff's burden at the first *McDonnell Douglas* stage is minimal, *see*

*Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 380-81 (2d Cir. 2001), to survive

summary judgment at the third stage, Plaintiff must present not just some evidence, but sufficient

evidence that Defendant's stated non-discriminatory reason was false and a cover-up for

discrimination, *see Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996).

Plaintiff has failed to do so for the same reasons that his evidence does not create a triable issue

as to inference of discrimination.

## Conclusion

　　　　Defendant has succeeded in showing that there is no genuine dispute as to any fact

material to Plaintiff's Title VII claims.  Viewing the evidence collectively and in the light most

favorable to Plaintiff, he has failed to raise an inference of discrimination and has therefore not

made out a *prima facie* case.  Even if Plaintiff could establish a *prima facie* case, he has not

raised a triable issue of pretext as to Defendant's legitimate, non-discriminatory reasons for the

decision to suspend Plaintiff.  Defendant is thus entitled to judgment as a matter of law.  The

Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 26), enter

judgment for Defendant, and close the case.

**SO ORDERED.**

Dated:  March 26, 2015
　　　　White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.